500 A.2d 431

FIDELITY FUND, INC.

v.

Joseph DI SANTO and Schiff Terhune Incorporated of Pa. Appeal of SCHIFF TERHUNE INCORPORATED OF PENNSYLVANIA, Appellant.

FIDELITY FUND, INC.

v.

Joseph DI SANTO and Schiff Terhune Incorporated of Penna.

Appeal of Joseph DI SANTO Appellant.

Superior Court of Pennsylvania.

Argued June 7, 1984.

Filed Sept. 20, 1985.

Reargument Denied Nov. 19, 1985.

114

---

Michael H. Egnal, Philadelphia, for appellee (at 132) and for appellant (at 133).

Walter W. Rabin, Philadelphia, for Fidelity, appellee.

Before McEWEN, TAMILIA and CERCONE, JJ.

CERCONE, Judge:

This is an appeal by defendants Joseph Di Santo and Schiff-Terhune Incorporated of Pennsylvania ("Di Santo", "Schiff-Terhune" or "defendants") from the denial by the lower court of their Exceptions to the lower court's Adjudication and the affirmance of the Decree Nisi as a Final Decree.[1] Specifically, defendants appeal from that part of the decree which orders defendants to account for all commissions received from insureds whose insurance needs were served by plaintiff through defendant Di Santo while he was employed by plaintiff and from that part of the decree which enjoins them, for two years, from soliciting the same insureds.

Di Santo also appeals from Conclusion of Law No. 7 set forth in the lower court's Adjudication which states that, "defendant Di Santo is entitled to no continuing share of commissions received by plaintiff after his resignation from plaintiff's employ, in insurance coverages sold by him during such employment."

Based on the reasoning which is set forth herein, we affirm in part and reverse in part and remand for further disposition consistent with this opinion.

1. The text of the Decree Nisi, pertinent to this appeal, reads:
 (1) Defendants Di Santo and Schiff-Terhune, as to any insurance coverages placed by either up to the date of this Decree for insureds whose insurance needs were served by plaintiff through defendant Di Santo during the period July, 1978 to February 4, 1982 are required and directed
 (a) to account to and reimburse plaintiff for any insurance brokerage commissions received by either .
 (b) to countermand with any insurer any designation of either as broker of record or as otherwise entitled to brokerage commissions
 (c) to request of any insurer the designation of plaintiff as broker of record or as otherwise entitled the brokerage commission for the term of any such policy.
 (2) Defendants Di Santo and Schiff-Terhune are enjoined for two years from the date of this Decree from soliciting the purchase of any form of insurance coverage, except life insurance, by any insured whose insurance needs were served by plaintiff or by defendant Di Santo during the period July 1978 to February 4, 1982, or from otherwise serving the insurance needs of any such insured.

The plaintiff, Fidelity Fund, Inc. ("Fidelity"), is in the insurance brokerage business. Defendant Joseph Di Santo was, for over 20 years, engaged in the insurance business as a broker or agent specializing in the production of large commercial accounts. During his working years, Di Santo developed a large number of contacts with commercial customers. In 1975, Di Santo sold his insurance agency and left the insurance business for a period of three years pursuant to a written noncompete agreement with the purchaser.

In July, 1978, plaintiff sought to expand its commercial insurance department. To facilitate this expansion, it hired Di Santo for the specific purpose of soliciting and obtaining commercial customers and to establish contacts with insurance companies through which to write the commercial policies. Di Santo was employed based upon an oral contract. There is no evidence or claim that the parties had agreed to an oral covenant not to compete. The plaintiff admitted that the employment contract made no provision as to whether, upon his termination of employment, Di Santo would forfeit commissions subsequently occurring and received by plaintiff on insurance coverages written by Di Santo during his employment.

Although Fidelity did not require or condition Di Santo's employment on his ability to persuade his previous clients to write insurance through Fidelity, a vice president of plaintiff testified that it was expected and hoped that Di Santo might do so. It is undisputed that Di Santo did in fact write some commercial insurance policies through Fidelity for clients he had developed prior to his employment there and for clients he subsequently developed independently of any information or leads imparted to him by Fidelity.

Upon termination of his employment with Fidelity, Di Santo began working for Schiff-Terhune Incorporated of Pennsylvania, a direct competitor of plaintiff. According to the findings of fact of the court below, in addition to employing Di Santo, Schiff-Terhune negotiated with him to purchase a list of customers for whom Di Santo had written

policies while in plaintiff's employ. The lower court did not determine which of these customers had been serviced by defendant Di Santo prior to his employment with plaintiff, which he had developed by his own contacts while in the employ of plaintiff, or which were customers developed by leads given to Di Santo by the plaintiff. While still employed by plaintiff, defendant Di Santo wrote insurance policies designating himself or Schiff-Terhune, rather than the plaintiff, as broker.

The issues on appeal are (1) whether the trial court's order is overbroad based on its misconstruction of the law of trade secrets and its application to the facts of this case and (2) whether the lower court erred by holding that Di Santo was not entitled to continue receiving his share of commissions received by plaintiff on insurance coverages sold by Di Santo during his employment with plaintiff.

In entering a verdict and judgment for the plaintiffs, the court below based its opinion on several conclusions of law. The holdings which are relevant to this appeal are:

1. Defendant, Di Santo is entitled to no proprietary right to his relationship with his insurance customers previous to his employment with plaintiff, or in his knowledge of their insurance needs, such as to keep the coverages he sold them during that employment from becoming plaintiff's trade secrets.

2. Defendant Di Santo violated the terms of his employment by plaintiff in every instance of his procuring cancellation of insurance policies for which any insurer carried plaintiff as broker of record, and substituting for such cancelled policies other coverages as to which he had himself named broker of record.

3. Defendant Di Santo violated the terms of his employment by plaintiff in every instance of his placing coverage with any insurer, and having himself named broker of record, regardless of such insurer being one not ordinarily available to plaintiff.

4. Defendant Di Santo had no authority to endorse and appropriate for his own use insurance brokerage com-

mission checks made payable to plaintiff, regardless of whether the insurer from whose coverage such commission derived was one ordinarily available to the plaintiff.

5. Defendant Di Santo was entitled to no greater share of commission deriving from coverage placed with an insurer not ordinarily available to plaintiff than of commission deriving from any other coverage placed by him during his employment by plaintiff.

6. Plaintiff is entitled to

(1) an accounting by defendant Di Santo,

(2) discovery in accordance with Rules of Civil Procedure in aid of such accounting, and

(3) reimbursement by Di Santo as to

(4) all commissions paid directly to him as broker of record on insurance coverages described in Conclusions of Law (2) and (3) above, as well as to

(5) the proceeds of any commission checks endorsed by him and appropriated to his own use as described in Conclusion of Law (4) above.

7. Defendant Di Santo is entitled to no continuing share of commissions received by plaintiff after his resignation from plaintiff's employ, on insurance coverages sold by him during such employment.

. . .

9. Plaintiff is entitled to recover from defendant Schiff-Terhune any commission received by it as broker of record on any insurance coverage placed for a customer whose insurance needs were served by plaintiff or defendant Di Santo during his employment by plaintiff.

10. Plaintiff, as to all commissions described in Paragraph 9 above, is entitled to

(1) an accounting by defendant Schiff-Terhune

(2) discovery in accordance with Rules of Civil Procedure in aid of such accounting

(3) reimbursement by defendant Schiff-Terhune

11. Plaintiff is entitled to a mandatory injunction requiring defendants Di Santo and Schiff-Terhune to countermand with any insurer any designation of either as broker of record on any insurance coverage described in Conclusions of Law 2 and 3 above, and to request the designation of plaintiff as broker of record on any such coverage.

12. Plaintiff is entitled to an injunction for a reasonable period of future time against defendants Di Santo and/or Schiff-Terhune soliciting or serving insurance needs of any insured whose needs were served by plaintiff by defendant Di Santo during the time of his employment by plaintiff.

Implicit in the above conclusions of law by the lower court is its finding, in discussion, that "the material Di Santo purveyed to his new employer, the corporate defendant, i.e., his knowledge of the names of the insureds in policies placed by plaintiff as broker and the expiration dates of those policies constituted plaintiff's trade secrets over which plaintiff is entitled to protection by a court of equity."

The trial court's application of the law of trade secrets is central to the first issue on appeal. If that court misconstrued the law or misapplied it to the facts, as we find that it did, then the enumerated conclusions of law must be adjusted accordingly.

To reiterate our scope of review, it is fundamental that the findings of fact of a chancellor will not be disturbed on appeal if there is adequate evidence in the record to sustain the findings. On the other hand, it is equally well established that the chancellor's conclusions, whether of law or fact, being no more than his reasoning from the underlying facts, are reviewable. *See Van Products Co. v. General Welding & Fabricating Co.*, 419 Pa. 248, 257, 213 A.2d 769 (1965).

We find that the lower court erred in concluding that the facts established a misappropriation of legally protected trade secrets, at least as it applies to those customers with

whom defendant Di Santo had a professional relationship prior to his employment with plaintiff and as to those customers Di Santo developed by his own individual efforts while employed by plaintiff. The decree, therefore, must be reversed in part.

The seminal Pennsylvania case which outlines the prerequisites to recovery upon a cause of action alleging misappropriation of trade secrets is *Macbeth-Evans Glass Co. v. Schnelbach*, 239 Pa. 76, 88 A. 688 (1913), where the court stated:

> To be entitled to equitable relief the burden was on (the employer) to show (1) that there was a trade secret, or, as in the case at bar, a secret process of manufacture; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to (the employee) while he was employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.

The question as to whether certain information is a "trade secret" of the employer's, thus restricting its use by the employee, is fraught with policy considerations which must be at the forefront of any analysis. The competing interests at stake have been laid out extensively elsewhere. *Accord: Wexler v. Greenberg*, 399 Pa. 569, 160 A.2d 430 (1960), and *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 162 A.2d 370 (1960). The problem of accommodating the competing policies can be stated thus: the right of a business person to be protected against unfair competition stemming from the usurpation of his or her trade secrets must be balanced against the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he or she is best suited. A further consideration in support of protecting certain information is to encourage technological development by assuring the creator that he will be

given the first chance to reap the benefits of his creation. We agree with a statement by the Supreme Court of Wisconsin:

> Customer lists are the very periphery of the law of unfair competition, because legal protection does not provide incentive to compile lists, because they are developed in the normal course of business anyway.

*Corroon & Black-Rutters & Roberts, Inc. v. Hosch,* 109 Wis.2d 290, 296, 325 N.W.2d 883, 888 (1982) (footnotes omitted).

 In asserting an equitable right to protection against the misuse of a trade secret, the burden is on the plaintiff to show that it held a trade secret and that the defendant had misappropriated it in violation of a confidential relationship. *Spring Steel, supra,* 400 Pa. at 360, 162 A.2d at 372; *Pittsburgh Cut Wire Co. v. Sufrin,* 350 Pa. 31, 34, 38 A.2d 33, 34 (1944). Based on the facts as found by the court below, the plaintiff, as a matter of law, has failed to meet this dual burden as to those customers with whom defendant Di Santo had contact prior to his employment with plaintiff and those customers he developed by his individual effort while employed by the plaintiff. Assuming, arguendo, that in certain situations customer lists and related information can be a trade secret, the plaintiff herein has failed to show it had the secret by reason of its own discovery or ownership or that the secret was communicated to the employee while he was employed in a position of trust and confidence. *See Macbeth-Evans, supra.*

We will discuss each of these elements so as to clarify the holding herein. The plaintiff did not assert, nor could it, that it had "discovered" the customers with which Di Santo had been previously affiliated. Neither did the plaintiff present evidence to prove that it "owned" the right to those customers by purchase of them from Di Santo. The trial court analyzed this issue by stating that the defendant did not own the right to service these customers to the exclusion of others. That is not the issue. The mere fact that defendant did not have that right does not mean that

plaintiff does have such a right. The plaintiff must prove affirmatively that it has the right by discovery, ownership, or confidential communication. There are numerous cases reported where an employer had purchased a customer list or had hired an employee based on the proposition that the employer has the right to that employee's customer contacts. *Accord: Alexander & Alexander, Inc. v. Drayton*, 378 F.Supp. 824 (E.D.Pa.1974). That is not the situation here. Plaintiff admitted that use of Di Santo's customer contacts was not a condition of employment.

The gravaman of liability for disclosure of a trade secret is whether the secret was communicated to the employee while he was employed in a position of trust and confidence. Clearly, if the information was originally in the employee's possession then it could not have been communicated to him by the employer so as to make it inequitable or unjust for the employee to disclose it to others.

■ If, as we conclude, plaintiff had no protectable interest in the names of customers previously known to the defendant or independently developed by him, the remaining issue is whether the policy expiration dates of which Di Santo purportedly came into possession from the plaintiff's records, are protectable trade secrets. Such information certainly does not raise to the level of "trade secret" as it is easily ascertainable by other legal methods. *See Bettinger v. C. Berk Associates, Inc.*, 455 Pa. 100, 314 A.2d 296 (1974). Here defendant would merely need to contact the customers to get such information. It is clearly the law of Pennsylvania that, unless enjoined by a restrictive covenant or by the misuse of confidential information peculiar to the employer's business, an employee may, upon termination of employment, engage in a rival business and acquire some of the former employer's customers.[2] To enjoin such behav-

---

**2.** In *Spring Steel, supra*, 400 Pa. at 363, 162 A.2d at 375, our Supreme Court specifically adopted comment "e" of section 393 of the Restatement Second of Agency as the prevailing law of this Commonwealth:

At the termination of his agency, in the absence of a restrictive agreement, the agent can properly compete with his principal as to matters for which he has been employed. See subsection 396.

ior, the plaintiff must prove illegal activity. The plaintiff herein has failed to show such illegality.

Based on the preceding reasoning, customers developed by Di Santo individually, and not as a result of "leads" given by plaintiff, during the course of his employment with plaintiff are not plaintiff's trade secrets. Here, too, plaintiff cannot prove that it had a protectable interest in the business of such customers previous to Di Santo's contacts with them. A similar situation was at issue in *Wexler v. Greenberg, supra.* There the defendant, a qualified chemist, was employed by plaintiff as its chief chemist. The defendant developed various new secret formulas. After eight years of employment, defendant entered into employment with a competitor of the plaintiff and sold the secret formula to the competitor. The court held that the chancellor erred in enjoining the defendants from using the formulas for primarily three reasons: (1) the alleged trade secrets had not been disclosed to defendant, (2) there was no express covenant restricting defendant's use of the formulas, and (3) plaintiffs had failed to show circumstances which implied a pledge of secrecy.

> Since it is conceptually impossible, however, to elicit an implied pledge of secrecy from the sole act of an employee turning over to his employer a trade secret which he, the employee, has developed, as occurred in the present case, the appellees must show a different manner in which the present circumstances support a permanent cloak of confidence cast upon Greenberg by the chancellor.

*Wexler v. Greenberg,* 399 Pa. at 578, 160 A.2d at 434.

As in *Wexler,* we can find no special circumstances which would indicate that the customers developed by Di Santo were of great concern or the result of special concentration

> Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of the employment, he can properly purchase a rival business and upon termination of employment immediately compete ...

by plaintiff. Di Santo's knowledge of the value of such customers and the harmful effects that competition could bring is insufficient, in itself, to support a finding that he was never to compete.

In support of its conclusion that defendants had misused plaintiff's trade secret, the lower court relied primarily on three cases: *Alexander & Alexander, Inc. v. Drayton, supra; United Insurance Co. of America v. Dienno,* 248 F.Supp. 553 (E.D.Pa.1965); and *Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957). Each of these cases is clearly distinguishable on the facts and, therefore, does not affect our holding. In *Alexander, supra,* the customer list in question had been purchased by the plaintiff and had been given to the defendant for use within the scope of his employment with the plaintiff. In *United Insurance, supra,* the defendant had been given the names of the plaintiff's existing customers as well as other valuable information which was necessary for the proper servicing of those customers. In *Morgan's Home Equipment, supra,* each defendant/salesman had been given a confidential route of customers coupled with a non-compete agreement in which each employee explicitly agreed not to disclose the names and addresses of plaintiff's customers. In *Denawetz v. Milch,* 407 Pa. 115, 121, 178 A.2d 701 (1962), the court noted that the customer lists in *Morgan* could only be assembled with great difficulty and were the direct result of the solicitor's efforts and experience.

■ Accordingly, we hold that appellants Di Santo and Schiff-Terhune had violated no trust or confidential relationship in contacting customers developed individually by Di Santo while in plaintiff's employ or customers known to Di Santo prior to his employment with plaintiff. We do find, however, that the lower court properly restrained defendants from soliciting insureds covered by Fidelity who were made known to Di Santo from leads provided by Fidelity, for two years.

The second issue on appeal is whether the lower court erred in denying Di Santo's counterclaim for unpaid commissions and in forfeiting all commissions occurring as a result of insurance policies written by him prior to the termination of his employment with plaintiff. The court below denied Di Santo's counterclaim on the theory that since the employment agreement was silent, he had no contractual right to the commissions.

Fidelity asserts two responses to the counterclaim. The first is that Di Santo failed to raise the issue in his Exceptions and, therefore, has failed to preserve it on appeal. Such a statement by appellee is not supported by the record. Defendant's Exception No. 12 excepts the chancellor's Conclusion of Law No. 7. Di Santo did not fail to preserve this issue for appeal. Fidelity further argues that the chancellor properly denied Di Santo's counterclaims stating, "It is hornbook law that one who breaches a contract cannot seek to recover under its terms. The prior breach [by Di Santo] relieves the innocent party [plaintiff] of any further obligations under the contract."

In determining whether appellant Di Santo is entitled to receive the disputed commissions, we are faced with conflicting policies under the law. Di Santo is seeking restitution. Restitution is a common form of relief in contract cases. It has as its objective not the enforcement of contracts through the protection of a party's expectation or reliance interests but the prevention of unjust enrichment through the protection of his restitution interest. *See* Restatement (Second) Contracts § 344 (1981). When determining whether a party is entitled to restitution, the courts must weigh several factors, including the materiality of the breach, by the party seeking restitution, as in this case, see Restatement (Second) Contracts § 241, and whether the forfeiture [3] is disproportionate to the benefit to be received

---

**3.** "Forfeiture", as used in the Restatement (Second) Contracts, refers to the denial of compensation that results when the obligee loses his right to the agreed upon exchange after he has substantially relied on

by the party against whom restitution is claimed. *See* Restatement (Second) Contracts § 229, comment b.

Plaintiff is seeking a forfeiture against Di Santo of those commissions. The employment contract contained no provision for forfeiture under any circumstances. Therefore, we must look to equitable principles. Equity, it has been said, abhors forfeiture and is greatly hesitant to enforce one. *See, Sgarlat v. Griffith,* 349 Pa. 42, 48, 36 A.2d 330, 333 (1944); *Shaw v. New Amsterdam Casualty Co.,* 310 Pa. 213, 216, 164 A.2d 916, 917 (1932); *Straup v. Times Herald,* 283 Pa.Super. 58, 68, 423 A.2d 713, 718 (1980). Although a forfeiture may be sustained in equity in some circumstances, equity should scrutinize the transaction to assure that all of the rights of the party from whom forfeiture is sought have been respected. *Barraclough v. Atlantic Refining Co.,* 230 Pa.Super. 276, 281, 326 A.2d 477, 479 (1974), citing *Murray v. Iron Hall of Baltimore City,* 9 Pa.Super. 89 (1898).

Finally, the law of agency takes a very severe approach to situations such as the one at hand. The Restatement (Second) of Agency § 469 (1958) states:

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of duty of loyalty, if such conduct constitutes a wilful and deliberate breach of his contract of service. He is not entitled to compensation even for properly performed services for which no compensation is apportioned.

> Comment b. A serious violation of a duty of loyalty or seriously disobedient conduct is a wilful and deliberate breach of the contract of service by the agent, and, in accordance with the rule stated in Section 456, the agent thereby loses his right to obtain compensation for prior services, compensation for which has not been apportioned.[4]

it and has substantially performed. *See* Restatement (Second) Contracts § 229, comment b.

4. We look to § 469 for guidance only. We are not hereby adopting that section in its entirety as the law of this Commonwealth.

We must weigh all of these principles and policies to reach our conclusion. In the case *sub judice*, defendant Di Santo intentionally and purposefully engaged in a course of conduct designed to deprive plaintiff of commissions which rightfully belonged to it. This is not a case, as in *Barraclough v. Atlantic Refining Co., supra*, where the literal fulfillment of the contract was prevented by oversight or uncontrollable circumstances and where the inadvertant breach was promptly remedied. Di Santo was hired by plaintiff for the explicit purpose of soliciting and obtaining commercial customers for plaintiff. Di Santo's compensation was based on a percentage commission on policies sold by him. Under the terms of the employment agreement, Di Santo was forbidden from selling insurance for anyone other than for plaintiff as broker. He breached this condition and wrote certain policies naming himself or Schiff-Terhune as broker of record. Although not explicitly stated in the findings of fact below, we can infer that it was the intention of the parties that plaintiff would benefit from this employment relationship by being named broker and would receive the broker's commission. Di Santo's breach clearly goes to the essence of the contract. Finally, although we may order defendants to repay all broker commissions illegally received, we have no way of gauging or compensating plaintiff for loss of customer good will which has occurred throughout these years of litigation.

We find no facts which weigh in favor of defendant Di Santo. Before he left plaintiff's employ, Di Santo intentionally committed numerous acts in violation of his employment relationship, and indeed, converted funds belonging to plaintiff. These acts were unconscionable and weigh against Di Santo on the scales of equity.

Accordingly, as to the order of the court below, we affirm in part and reverse in part, that is, plaintiff is entitled to recover from the defendants any commission received by either as broker of record on any insurance coverage placed for a Fidelity customer while defendant Di Santo was employed by plaintiff. We concur with the lower court's

finding that Di Santo's cancellation of policies and rewriting them as his own as broker constituted a clear breach of fiduciary duty and was contrary to the terms of employment. We further concur with the lower court insofar as it determined that, by his actions, Di Santo forfeited any commissions due to him on those policies written during his course of employment with plaintiff in which he listed himself or Schiff-Terhune as broker. However, we do not find that Di Santo forfeited any commissions which might be owed to him on policies properly written by him.

Affirmed in part; reversed in part; and remanded for further disposition and accounting consistent with this opinion.